**Opinion filed August 11, 2016**



# In The

# Eleventh Court of Appeals

_____

## No. 11-14-00129-CR

_____

## LANNY MARVIN BUSH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**

**Coleman County, Texas**

**Trial Court Cause No. 2602**

## M E M O R A N D U M   O P I N I O N

The jury convicted Lanny Marvin Bush of capital murder for the kidnapping and murder of Michele Monique Reiter. The court assessed Appellant's punishment at confinement for life without parole and sentenced Appellant accordingly. Because we hold that there is insufficient evidence to support a conviction for capital murder based on kidnapping, we reverse. However, because we find that the

evidence is sufficient to support the lesser included offense of murder, we remand this cause to the trial court to reform the judgment to reflect a conviction of murder and to conduct a new trial as to punishment only.

Reiter lived with her roommate, Denise "Denny" Worrell, in Brownwood. Reiter did not come home one night after she left for a dinner that she had planned with someone whom Reiter believed was a friend from school. Police later found Reiter buried in a shallow grave in Coleman County.

Appellant presents three issues for our review. In Appellant's third issue, he argues that the trial court erred when it denied his motion to suppress as it related to a video recording of his police interrogation. We review a trial court's ruling on a motion to suppress for an abuse of discretion, applying a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). The bifurcated standard requires that we give great deference to the trial court's findings of historical facts supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim. App. 2007). However, we review de novo the trial court's determination of the law and its application of law to facts that do not turn on an evaluation of credibility and demeanor. *Id.* at 527; *Davila v. State*, 4 S.W.3d 844, 847–48 (Tex. App.—Eastland 1999, no pet.). We view the evidence in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 436, 444 (1966). The defendant bears the initial burden of proving that the statement is the product of

custodial interrogation. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009). "[B]eing the 'focus' of an investigation does not necessarily render a person 'in custody' for purposes of receiving *Miranda* warnings or those required under article 38.22 of the Code of Criminal Procedure." *Id.* at 293. There are four general situations that may constitute custody for purposes of *Miranda* and Article 38.22: (1) the accused is physically deprived of his freedom of action in a significant way; (2) a police officer tells the accused he is not free to leave; (3) police officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the accused, and police officers do not tell him that he is free to leave. *Id.* at 294. Nevertheless, we consider the totality of the circumstances surrounding an interrogation to determine whether the person was in custody during the interrogation. *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996) ("The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances."); *see also Blain v. State*, No. 11-12-00212-CR, 2013 WL 4052540, at *2 (Tex. App.—Eastland Aug. 8, 2013, no pet.) (mem. op., not designated for publication).

We have reviewed the video recording as presented to the jury. When Appellant first arrived in the interview room, Ranger Hanna and Appellant had a short, casual conversation. When Ranger Crawford came into the room, Ranger Hanna began to explain why Appellant was present and the expectations of the interview. The conversation proceeded as follows:

> RANGER HANNA: You didn't want to, I mean, you didn't want to talk to, to [officers with the Brownwood Police Department], but you're are okay with talking with us.

> APPELLANT: Yea, I'm okay with that.

RANGER HANNA: In fact, you've driven down here on your own.

APPELLANT: Right.

RANGER HANNA: Alright, and you understand right now we're not telling you you're under arrest, you're . . . not going to be free to, to leave right now. So this is like a voluntary interview is what we want to be clear on. You agree with that?

APPELLANT: Yes, Sir.

Appellant argues that the statement that Appellant was not free to leave shows that the interview was custodial. Appellant further argues that, because the rangers failed to Mirandize Appellant prior to the start of this questioning, the trial court erred when it denied Appellant's motion to suppress. However, we disagree that Ranger Hanna ever told Appellant that he was not free to leave. Although Ranger Hanna stumbled on his words, he expressed to Appellant that (1) he was *not* telling Appellant that he was under arrest and (2) he was *not* telling Appellant that he was not free to leave.

Even if Ranger Hanna told Appellant that he was not free to leave, several facts indicate that this video recorded interview was not custodial. First, Appellant requested to meet with the rangers. Second, Appellant drove himself and came with his girlfriend to the police station. Additionally, at the time that Ranger Hanna allegedly told Appellant that he was not free to leave, Ranger Hanna was quickly going over the voluntary aspect of the interview. This portion of the interview was less than thirty seconds. The entire conversation between the rangers and Appellant indicated that they all believed that Appellant was free to leave at any point during the interview. The rangers requested consent to search Appellant's laptop, cell

4

phone, and pickup. When the rangers discussed whether Appellant would consent to a search of these items, Appellant became concerned with whether the rangers would have time to search his pickup prior to work the next day. The rangers offered to provide him with transportation to work and to help him load his tools into the substitute vehicle. This conversation indicates that the rangers, as well as Appellant, believed that he was free to leave and could return to work the next day.

Moreover, Appellant asked to speak to his girlfriend to discuss the situation regarding his pickup. The rangers permitted Appellant's girlfriend to enter the interview room, discuss the situation with him, leave, and wait for Appellant in another room.

Appellant also argues that he requested an attorney and that the rangers ignored this request. A request for an attorney must be unambiguous. *Dowthitt*, 931 S.W.2d at 257. When Appellant first questioned his need for an attorney, Appellant was not talking to the rangers. Rather, Appellant and his girlfriend were discussing the possibility that he needed to talk to an attorney about the consent to search his pickup. This was not a specific, unambiguous request for an attorney. *See id.*

Finally, when Appellant did unambiguously request an attorney, the rangers ended all questioning and permitted Appellant to leave the interview room and the station. However, by the time that Appellant had made it outside the station, the rangers had decided to place him under arrest for online impersonation. At this time, the rangers read Appellant his *Miranda* rights, and Appellant voluntarily waived those rights. All these factors weigh against a determination that the initial portion of Appellant's interview was custodial. We find that the trial court did not err when it denied Appellant's motion to suppress. We overrule Appellant's third issue.

5

In Appellant's first issue, he argues that the evidence is factually insufficient to show that he was the person who committed the murder. In Appellant's second issue, he argues that the evidence is legally insufficient to support a conviction for capital murder because there is insufficient evidence of kidnapping. Under *Brooks v. State*, we no longer complete separate factual and legal sufficiency reviews. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). We review the sufficiency of the evidence, whether denominated as a legal or as a factual sufficiency claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 912; *Polk*, 337 S.W.3d at 288–89. Under the *Jackson* standard, we examine all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In our review, we will give deference to the duty of the factfinder to resolve credibility issues and to weigh the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Under Section 19.03(a)(2) of the Texas Penal Code, a person commits capital murder if "the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat." TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2015). The State charged Appellant with intentionally causing the death of Reiter while in the course of committing or attempting to commit the offense of kidnapping.

6

Appellant and Reiter were romantically involved for approximately five years prior to her death. When Reiter ended her relationship with Appellant, she cut off almost all communication with him, but he continued to call and text her often. Appellant created a Facebook page under the name "Rocky Switzer" so that he could continue to communicate with Reiter by pretending to be someone with whom Reiter had previously gone to school. Reiter began to communicate with "Rocky Switzer" about relationships, including her former relationship with Appellant. At that time, Reiter was dating a married man, William Kemper Croft. Reiter agreed to have dinner with "Rocky Switzer." Reiter and "Rocky Switzer" planned to meet at 8:30 on the night she went missing. After they had made plans to meet, but before the scheduled meeting time, Appellant told Croft's wife about her husband's relationship with Reiter. Croft's extramarital affair with Reiter ultimately caused Croft and his wife to get a divorce.

Reiter told Worrell about her date with "Rocky Switzer," and Worrell testified that Reiter was looking forward to meeting with him. Worrell last saw Reiter at approximately 6:15 on the night she went missing. At around 7:56 that night, Worrell received the following text message from Reiter's phone: "Rock[y] called and is here early going to meet him will be home late." Worrell testified that this text message was strange because it was lengthy, because it was not typed in the style that Reiter typically communicated, because "Rocky" was not much earlier than planned, and because she already knew Reiter would be late. Worrell further testified that the conversation was strange because Reiter did not respond to Worrell's reply message. Worrell explained that she replied to the text and that she expected Reiter to respond back because Reiter was the type of person that had to

have the last word in a conversation. During Appellant's interview, Appellant admitted that he sent the text message to Worrell from Reiter's phone.

Reiter and Worrell had an agreement that, if Worrell did not hear from Reiter for a length of time, Worrell was to contact the police. When Reiter was not home by the next morning, Worrell reported her missing. Worrell testified that Reiter would not have met Appellant in a private location. Additionally, Yolanda Nino, Reiter's coworker, testified that Reiter was scared of Appellant. Appellant told Ranger Hanna and Ranger Crawford that Reiter wanted to meet him in a location that was not too public or too private. The police began to investigate, and Worrell called Appellant to see if he had any information on Reiter's whereabouts.

Appellant told Worrell that he had not seen Reiter, and he denied any knowledge of her whereabouts. Worrell and Appellant continued to have conversations through text messages about the investigation and what had happened to Reiter. At one point, in an effort to explain why he had caused difficulties for Reiter, Appellant told Worrell that "he just wanted to hurt [Reiter] as bad as she hurt him." Further, through a text message, Appellant told Worrell that he knew Reiter was alive and that she would come home when it all died down. After Reiter's disappearance, Appellant asked Worrell if he could look at Reiter's wardrobe to see if she took clothes with her. When Worrell told Appellant that the police had sealed the room, he asked if the police believed she had been abducted. Additionally, Worrell testified that prior to Reiter's disappearance, Appellant left Reiter a voicemail in which he said that bad people would put drugs in her drink and hurt her.

Phone records showed that, at 6:15 on the night that Reiter went missing, her phone was near her home, and Appellant's phone was at the Bert Massey Sports

Complex. At 6:17 p.m., there was a phone call between Reiter and Appellant that lasted for approximately three minutes. At approximately 6:30 that night, both Appellant's and Reiter's phones were at the sports complex, the location where Reiter's car was later found. The phone records further showed that, around 6:40 p.m., both phones were on a back road that ran south from Brown County to Santa Anna in Coleman County. Near 7:00 that night, cell tower records revealed that the phones were in the Bangs area, a path that continued along the back road toward Santa Anna. The records showed that the phones then reached the location where Reiter's body was found. In fact, these phone records were the means by which Reiter's body was found.

The phone logs further showed that Appellant's phone left the location of Reiter's burial site and returned to his home on the night Reiter went missing. However, Reiter's phone stopped communicating with phone towers at 8:55 on the night she went missing. The next morning, Appellant's phone communicated with phone towers within several miles of Reiter's burial site. Around this same time, Reiter's phone briefly communicated with towers near her burial site and then did not communicate with any towers again. Her phone was never located.

Reiter's car was found in the sports complex parking lot. There were no signs of a struggle in or near the vehicle. Reiter's unclothed body was found in a shallow grave under a bridge. According to the record, this location was concealed from the view of persons driving on the highway. Due to the decomposition of the body, the medical examiner, Dr. Marc Krouse, could not determine Reiter's cause of death. There were no stab wounds, no gunshot wounds, no evidence of natural disease, no evidence of strangulation, and no evidence of injury. Based on the autopsy,

Dr. Krouse could not rule out death by asphyxiation by snubbing or overlay, and he noted that there was strong evidence of foul play.

Before Reiter's disappearance, Appellant often called and often sent text messages to Reiter. According to what Appellant told the rangers, there was a time period after Reiter's disappearance when Appellant possessed her phone; Appellant made only a few calls to Reiter's phone during that time.

Ranger Hanna and Ranger Crawford interviewed Appellant before Reiter's body had been found. At first, Appellant told the police that he did not see Reiter on the day that she went missing. He admitted that he created "Rocky Switzer" and that the two had agreed to meet the night that Reiter went missing. However, he told the Rangers that the purpose of this meeting was for Reiter to get "stood up" by "Rocky Switzer." Later in the interview, Appellant admitted to meeting with Reiter on the date that she went missing, but before Reiter was scheduled to meet "Rocky Switzer." At one point in the interview, Appellant stated that he had had sex with Reiter that day and that they had talked about getting back together.

The record shows that a shovel was used at the burial site to move dirt onto Reiter's body. When the police searched Appellant's pickup, they found a shovel in the bed of his pickup. The record indicates that this was not something Appellant normally carried in his pickup. Ranger Hanna testified that the shovel was not swabbed and tested because it had rained since Reiter's disappearance. He explained that, because the shovel was in the bed of the pickup, he believed that any biological evidence would have been removed due to the rain. Ranger Hanna further testified that refrigerant was found in Appellant's pickup and that refrigerant can cause an individual to die by asphyxiation.

A search of Appellant's computer showed internet searches for information on drugs that can knock a person out. The searches included information on natural and over-the-counter "knockout drops." Appellant also searched for where the heart and the lungs were located in the human body. He searched for "[B]rownwood [T]exas police blotter" and "Missing Person Protocol." He further searched for information on how one could know whether someone was cheating on him and how to get over a breakup.

Appellant's daughter, Jennifer High, testified that Appellant contacted her on the night of Reiter's disappearance. During their conversation, Appellant stated that Reiter was missing and that her car was at the sports complex. This conversation occurred prior to the phone call that Worrell made to Appellant in which she told him that Reiter was missing.

Further, Appellant's nephew, Marvin Don Thompson, testified that, prior to Reiter's disappearance, Appellant asked Thompson which family member possessed a .32 caliber gun that had previously belonged to Thompson's late grandfather. On the day of Reiter's disappearance, Appellant purchased .32 caliber ammunition.

We first determine whether the State proved kidnapping—the aggravating element of capital murder as charged in this case. *See* PENAL § 19.03(a)(2). "A person commits the offense of kidnapping by intentionally or knowingly restricting a person's movements, by either moving the person from one place to another or confining the person, without consent." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) (citing PENAL §§ 20.01(1)(A), (2)(A) & (B), 20.03(a)). This restriction of movement can be accomplished by force, intimidation, or coercion, so as to substantially interfere with the person's liberty. *Id.* The act or acts must be done with the intent to prevent the person's liberation by either secreting or holding

her in a place where she is not likely to be found or using or threatening to use deadly force. *Id.* Deadly force is "force intended or known by the person acting to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* "The offense of kidnapping is complete when the restraint is accomplished and there is evidence that the defendant intended to restrain the victim by either secretion or the use or threat to use deadly force." *Id.* (citing *Mason v. State*, 905 S.W.2d 570, 575 (Tex. Crim. App. 1995)).

The State argues that the following evidence is sufficient to show kidnapping: Reiter is dead; Reiter's body and car were found in remote locations; the route along which Appellant's and Reiter's phones were traced ran to the burial site and went through rural, remote locations; the autopsy noted a suggestion of foul play; asphyxiation by snubbing or overlay or death from exposure to refrigerant could not be ruled out; Appellant purchased .32 caliber ammunition and may have had access to a .32 caliber weapon; Appellant used the word "abduction" when talking about Reiter's disappearance with Worrell; Appellant left Reiter a voicemail in which he said that other individuals would "put drugs in her drink"; Reiter would not have willingly gone to a rural location; and there is no evidence that Reiter was murdered where her car was found. We disagree that this evidence shows that Appellant kidnapped Reiter.

The record does not provide the time or date of Reiter's death. The record does not indicate whether Reiter was alive at the time that phone records show that her phone and Appellant's phone signals left the sports complex on the night she went missing. Although the State argues that Reiter would not go with Appellant to a rural location—her burial site, the evidence shows that Reiter met with Appellant in a remote location—the sports complex. There is no evidence that the meeting at

12

the sports complex was against Reiter's will. Likewise, the record does not indicate whether Reiter left the sports complex willingly with Appellant or whether Reiter was even still alive when she left the sports complex. In addition, although the State argues that there is no evidence that Reiter was killed at the sports complex, there is also no evidence that Reiter was killed at the burial site or in Appellant's vehicle. Thus, without evidence that Reiter was moved from one place to another or confined without consent prior to her death, a rational juror could not believe beyond a reasonable doubt that Appellant kidnapped Reiter from the sports complex. *But cf. Valdez v. State*, No. 08-10-00331-CR, 2012 WL 4928905, at *1–2, 7–9 (Tex. App.— El Paso Oct. 17, 2012, pet. ref'd) (not designated for publication) (explaining that victim's voluntary accompaniment with defendant to his house did not preclude the possibility that a kidnapping subsequently occurred and holding that the evidence was sufficient to support the kidnapping element of a capital murder conviction where victim told police that she had been held against her will).

Additionally, a rational juror could not believe beyond a reasonable doubt that Appellant attempted to kidnap Reiter. A person commits attempted kidnapping when, with the specific intent to commit kidnapping, "he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." PENAL § 15.01(a) (West 2011). The State argues that the following evidence indicates that Appellant attempted to kidnap Reiter: Appellant searched for knockout drugs or drops, how to get over a breakup, and how to know whether Reiter was cheating; Appellant left Reiter a voicemail that indicated that other people would put drugs in her drink; Appellant created a fake Facebook page to keep in contact with Reiter; and on the day of Reiter's disappearance, Appellant purchased ammunition for the same caliber gun to which he may have had access.

Our review of the evidence does not show that Appellant completed an act amounting to more than mere preparation as required by the Penal Code. *See id.* From our review of the computer forensic documents, it appears that the internet searches for knockout drugs are from July, two months prior to Reiter's disappearance. Moreover, there is no evidence that Appellant purchased, made, or obtained these drugs. Appellant purchased .32 caliber ammunition, but the record does not indicate that Appellant actually obtained the gun that he had mentioned to his nephew. Although the evidence shows that Appellant, as "Rocky," was to meet Reiter later for dinner, he, not as "Rocky" but as himself, met her at the sports complex two hours earlier than the scheduled meeting time. Therefore, the planned date never occurred. Even if internet research, purchasing ammunition for a gun that the evidence does not show that Appellant possessed, and setting up a meeting in a public parking lot indicates that Appellant wanted to kidnap Reiter, these acts do not go beyond mere preparation.

The evidence also does not support the State's theory that Appellant lured Reiter to a location from which he could kidnap her either by posing as "Rocky" or by promising that he would return her property. As we have discussed, the meeting with "Rocky" never occurred; thus, the planning of that meeting did not amount to an act beyond mere preparation.

At trial, the State also argued that Appellant lured Reiter to the sports complex by deception in that he told her that he was going to give some of her belongings back to her when he had no intention of returning her things. Although Ranger Hanna testified that Appellant admitted during the interview that he did not have the computer with him on the day that Reiter went missing, the computer was not the only item that Appellant told police he was trying to return to Reiter.

Appellant also told police that he was going to return a jacket, a camera, and a "chip" or SIM card for a cell phone. In his interview, Appellant told Ranger Hanna that he did not take the computer with him on the day that he was supposed to meet Reiter. He said that he never carried it with him and that he always left it at the house. Appellant did not tell Ranger Hanna that he left the other items at his house or that he otherwise did not have them with him on the day Reiter went missing. We have found no other evidence in the record that indicates that Appellant did not have the items with him. There is also no evidence of what Appellant told Reiter in the three-minute conversation prior to the time that Reiter met Appellant at the sports complex. Therefore, the record does not support the State's argument to the jury that Appellant lured Reiter to the sports complex by deception. *But cf. Martinez v. State*, No. 03-00-00581-CR, 2001 WL 223259, at *3 (Tex. App.—Austin Mar. 8, 2001, pet. ref'd) (not designated for publication) (holding that evidence was sufficient to support the kidnapping element of a capital murder conviction where the record showed that defendant lured the victim into the car under false pretenses by telling the victim that he needed her to help pick up a friend's car that did not exist).

We hold that the evidence is insufficient to show that Appellant kidnapped or attempted to kidnap Reiter. Thus, the evidence is insufficient to support Appellant's conviction for capital murder. We sustain Appellant's second issue.

Because we have found that the evidence is insufficient to support Appellant's conviction for capital murder as charged in the indictment, we must now decide whether the conviction should be reformed to reflect a conviction for a lesser included offense. *See Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014). A conviction should be reformed when (1) every element necessary to prove

15

the lesser included offense was found when the appellant was convicted of the greater offense and (2) the evidence is sufficient to support a conviction for the lesser included offense. *Id.* First-degree murder is a lesser included offense of capital murder, and the jury necessarily found that Appellant intentionally or knowingly killed Reiter when it convicted him of the capital murder of Reiter. *See* PENAL §§ 19.02, 19.03. Therefore, we will review the evidence to determine whether it is sufficient to support a conviction for murder. *See Thornton*, 425 S.W.3d at 300, 307.

Appellant argues in his first issue that the evidence is factually insufficient to show that he is the person that murdered Reiter. Although we are no longer reviewing Appellant's argument as it relates to the capital murder, we believe his argument also applies to our consideration of the lesser included offense of first-degree murder. However, as we have stated, we will review Appellant's challenge to the factual sufficiency of the evidence as a challenge to the legal sufficiency of the evidence. *See Brooks*, 323 S.W.3d at 912; *Polk*, 337 S.W.3d at 288–89.

Appellant specifically argues that Croft, the married man whom Reiter was dating at the time of her death, had the motive to kidnap and murder Reiter; that there was no eyewitness testimony, fingerprint evidence, or DNA evidence linking Appellant to Reiter's murder; and that there was no evidence of a murder weapon or cause of death, much less any evidence to link Appellant to a weapon. Even though we agree with Appellant's assertions regarding a lack of forensic evidence linking Appellant to the murder, we do not agree that other evidence, including circumstantial evidence, is insufficient to link Appellant to Reiter's murder.

The evidence shows that Appellant had the opportunity to murder Reiter. His phone and her phone were in the same locations throughout the evening of her disappearance, and the last place for which her phone provided location data was the

16

location where her body was found. The records indicate that Appellant's phone signal showed a return to his home in San Angelo between 11:00 p.m. and midnight that night but that Reiter's phone did not communicate again with any towers after 8:55 p.m. The next morning, Appellant's phone communicated with phone towers within several miles of Reiter's burial site. Around this same time, Reiter's phone briefly communicated with towers near her burial site and then did not communicate with any towers again. Thus, the record supports a reasonable inference that Appellant was the last person to see Reiter alive and that Appellant returned to Reiter's burial site the next morning. In addition, Detective Brian Tompkins of the Brownwood Police Department testified that he ruled out Croft as a potential suspect because the cell phone records showed that Appellant's and Reiter's phones were in the same locations throughout the night of her disappearance.

Further, Appellant had a difficult time dealing with his breakup with Reiter. This difficulty was evident from his conversations with Reiter as "Rocky Switzer" and his internet searches that included how to get over a breakup. "Rocky" told Reiter multiple times that he was having a hard time getting over his most recent ex-girlfriend. And Appellant told Worrell that he wanted to hurt Reiter as bad as she hurt him.

Finally, although Dr. Krouse could not determine Reiter's cause of death, he did determine that, based on the circumstances surrounding her death, there was strong evidence of foul play. Dr. Krouse also testified that he could not rule out asphyxiation. Ranger Hanna testified that refrigerant was found in Appellant's pickup and that it could cause death by asphyxiation. From this evidence, we find that a rational jury could have found beyond a reasonable doubt that Appellant

murdered Reiter. *See Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. We overrule Appellant's first issue.

Appellant's judgment of conviction for capital murder is reversed. We remand this cause to the trial court to reform the judgment to reflect a conviction for the offense of murder and to conduct a new trial as to punishment only. *See Thornton*, 425 S.W.3d at 300, 307.


JIM R. WRIGHT

CHIEF JUSTICE


August 11, 2016

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.